United States District Court
Eastern District of New York

2:18-cv-02977

Franco Condon individually and on behalf of all
others similarly situated

                         Plaintiff

            - against -

Unilever United States, Inc.

                         Defendant

Complaint

The above-named plaintiff individually and on behalf of all others similarly situated, by attorneys, alleges upon information and belief, except for those allegations pertaining to plaintiff, which are based on personal knowledge:

1.      Unilever United States, Inc. ("defendant") manufactures, distributes, markets, labels and sells frozen dairy desserts under the Breyers brand.

2.      Recent years have seen the emergence of "better for you" ice cream-type products, which promoted themselves as low in calories and fat, yet high in protein.

3.      Those companies attracted consumer dollars which would have gone to defendant's products, reducing their market share.

4.      In response, defendant introduced Breyers Delights is a product line extension of Breyers and is represented as "light ice cream" and/or "low-fat ice cream."

5.      The Products are available in numerous flavors and sold in one pint containers.

6.      The common front label representations include Breyers Delights, "made with fresh cream," the flavor, the number of calories per pint overlaid on a spoon, "low fat ice cream" and the amount of protein per pint.

7.      The side panel of each Product states:

Indulgence without all the guilt! Who knew a whole pint of delicious ice cream was 310 calories - we did! That's because here at Breyers we have over 150 years of experience making mouth-watering ice cream. We start with high quality ingredients, naturally sourced flavors, and all American dairy. This creamy indulgence will have your taste buds in disbelief for every yummy spoonful and it's even a good source of protein! So grab a spoon and see what we mean! Go on, enjoy!

Principal Display Panel                Supplemental Panel




8.      People enjoy ice cream due to its sensory attributes, which include a rich sweet flavor, a smooth, creamy, and viscoelastic texture, and a cold sensation that contrasts to the warmth of most other foods.

9.      Until the 1990s, any product with "ice cream" in its name had to meet certain requirements, which related to ingredients (i.e., dairy), non-ingredients (performance characteristics such as physical properties like texture, melting point, freezing point, flavor (e.g.,

aroma and taste), functional properties (e.g., body, spreadability), and shelf life) and a minimum percent of milkfat (ten).[1]

10.    If the product had less than ten percent milkfat it was required to be named "ice milk."

11.    However, acting at the direction of Congress, the FDA enabled regulations allowing for modified versions of standardized foods, by permitting an express nutrient content claim to precede a standardized food's name, essentially creating new standards of identity.[2]

12.    An expressed nutrient content claim is any direct statement about the level (or range) of a nutrient in the food, such as calories or fat.[3]

13.    Products were now permitted to be named "ice cream," modified with an express nutrient content claim relating to the characterizing ingredient of milk fat.

14.    The expressed nutrient content claims were (1) reduced fat, having 25% less fat than a reference product,[4] (2) light, a 50% reduction in total fat from the reference product, or one-third reduction in calories if fewer than 50% of the calories are from fat,[5] (3) low fat, having not more than 3 g of total fat per serving[6] and (4) nonfat or fat free, with less than 0.5 g of fat per serving.[7]

15.    Modified versions of standardized foods were required to be equivalent from a nutritional and performance standpoint with respect to the standardized food.[8]

16.    Adjustments to the composition and structure of the standardized food were permitted, but only in the minimum amount necessary to qualify for the nutrient content claim

---

[1] 21 C.F.R. § 135.110
[2] 21 C.F.R. § 130.10
[3] 21 C.F.R. § 101.13
[4] 21 C.F.R. § 101.62(b)(4)
[5] 21 C.F.R. § 101.56
[6] 21 C.F.R. § 101.62(b)(2)
[7] 21 C.F.R. § 101.62(b)(1)
[8] 21 C.F.R. § 130.10(b)

while maintaining similar performance characteristics (i.e., moisture content, food solids content requirements, or processing conditions).[9]

17.     These adjustments allowed for incorporation of new types of ingredients ("safe and suitable," among other requirements), since it was expected manufacturers would face challenges in compensating for the removal of milkfat.

18.     The requirements/restrictions for these other ingredients include:

- performance of an appropriate function in the food (i.e., improve texture, add flavor, prevent syneresis, extend shelf life, improve appearance)[10]

- any ingredient or component of an ingredient specifically required by the standard was not permitted to be replaced or exchanged with a similar ingredient from another source unless the standard specifically allowed it[11]

- fat analogs can be added to replace fat and calories, subject to the relevant regulations[12]

19.     The most significant challenge involved replacement of milkfat.

20.     Fat analogs are used in modified versions of standardized foods to improve texture, add flavor, add sweetness, prevent syneresis, extend shelf life, or improve appearance, must meet multiple requirements.

21.     Milk fat increases the richness of flavor, is a good carrier and synergist for added flavor compounds, because most flavors, natural and artificial, are fat soluble.

22.     Milk fat produces a characteristic smooth texture by lubricating the palate, helping

---

[9] 21 C.F.R. § 130.10(c)
[10] 21 C.F.R. § 130.10(d)(1)
[11] 21 C.F.R. § 130.10(d)(2)
[12] 21 C.F.R. § 130.10(d)(5); see also 21 C.F.R. § 130.10(c), (d)(1), and (d)(2).

to give body to the ice cream.

23.    Milk fat produces desirable melting properties, because it inhibits the formation of large ice crystals.

24.    This impacts the ice cream's shelf life because its moisture content may increase significantly with the reduction of fat, which can lead to the formation of large ice crystals because the higher level of free moisture makes the product less freeze-thaw stable.

25.    Milk fat also aids in lubricating the freezer barrel while the ice cream is being frozen.

26.    Fat reduction is challenging because as fat is removed from ice cream, other ingredients must be added to keep the water content within reasonable limits.

27.    Too much water means too much ice is in the frozen product resulting in it being excessively hard, cold and icy with weak body and poor keeping quality.

28.    Technological advancements enabled the formulation of reduced-fat or light ice creams to about 4–5% fat, with traditional ingredients.

29.    For instance, a low-temperature extrusion process, under defined shear conditions, can lower fat products with similar textures to their full fat counterparts due to reduced ice crystal and air bubble size distributions.

30.    However, when ice cream products contain less than 4% fat, fat replacers are needed.

31.    Food manufacturers are permitted to utilize fat analogs to accomplish the desired reductions in fat while maintaining product performance.

32.    To reduce fat content while maintaining performance characteristics to meet consumer expectations with respect to resemblance of traditional ice cream, fat needs to be replaced or exchanged in the minimum amount necessary.[13]

---

[13] 21 C.F.R. § 130.10

33.    Manufacturers turn to "fat replacers," which encompasses the following terms.

34.    "Fat extender" refers to partial removal of fat from a particular food and substitution with a replacement ingredient

35.    "Fat substitutes" or "fat analogs" have the characteristics of fats but with fewer or no calories, altered digestibility and altered nutritional value.

36.    "Fat mimetics" replace part of the fat of a product and can imitate at least one but not all functions of fat in a food.

37.    Their main requirement is to provide fewer calories to the product than do traditional fat sources, either through reduction of required weight in the mix or through caloric reductions per unit weight.

38.    Fat replacers are classified by the materials that comprise them: carbohydrate, protein, or fat-based.

39.    Carbohydrate-based fat replacers are based on starch, dextrins, maltodextrins, polydextrose, fiber, that have been modified physically, chemically, or enzymatically to provide fat-like properties.

40.    They help replace the mouthfeel of fats, provide lubrication, slipperiness, and add bulk, viscosity, structure, and texture.

41.    They function by stabilizing substantial quantities of water in a gel-like matrix, resulting in lubricant and flow properties similar to fats while helping to limit growth of ice crystals

42.    Their use is limited by their high associated-water content that increases the water activity of the product.

43.    The Products contain a significant amount of "soluble corn fiber" ("SCF")

designated as the second most predominant ingredient.[14]

| Nutrition Facts | | | | |
|---|---|---|---|---|
| 3 servings per container | | | | |
| **Serving size** | | **2/3 cup (91g)** | | |
| | | Per serving | | Per container |
| **Calories** | | **100** | | **310** |
| | | % DV* | | % DV* |
| **Total Fat** | 3.5g | **5%** | 11g | **14%** |
| Saturated Fat | 2g | **10%** | 7g | **35%** |
| Trans Fat | 0g | | 0g | |
| **Cholesterol** | 10mg | **3%** | 30mg | **10%** |
| **Sodium** | 50mg | **2%** | 150mg | **7%** |
| **Total Carb.** | 23g | **8%** | 69g | **25%** |
| Dietary Fiber | <1g | **2%** | 2g | **6%** |
| Total Sugars | 7g | | 20g | |
| Incl. Added Sugars | 2g | **3%** | 5g | **10%** |
| Sugar Alcohol | 8g | | 25g | |
| **Protein** | 7g | **13%** | 20g | **39%** |
| Vitamin D | 0mcg | 0% | 0mcg | 0% |
| Calcium | 190mg | 15% | 580mg | 45% |
| Iron | 0.5mg | 2% | 1.5mg | 8% |
| Potassium | 190mg | 4% | 570mg | 10% |

**INGREDIENTS:** SKIM MILK, SOLUBLE CORN FIBER, ERYTHRITOL, MILK PROTEIN CONCENTRATE, CREAM, **LESS THAN 2% OF:** SUGAR, VEGETABLE GUMS (GUAR, CAROB BEAN), NATURAL FLAVOR, REB A (STEVIA LEAF EXTRACT), VITAMIN A PALMITATE.

44.    SCF is related to maltodextrin, an ingredient which has long been associated with ice cream.

45.    Maltodextrins are starch ingredients with a dextrose equivalent ("DE") <20, used in ice cream as bulking agents and to contribute to sweetening in place of sugar.

46.    When the dextrose equivalence of maltodextrin is DE <10, its structure changes, enabling it to provide fat-replacing properties.

47.    SCF has a DE <10 and is produced through partial hydrolysis of corn starch by acid

---

[14] Skim Milk, Soluble Corn Fiber, Erythritol, Milk Protein Concentrate, Cream, Less Than 2% Of: Sugar, Vegetable Gums (Guar, Carob Bean), Natural Flavor, Reb A (Stevia Leaf Extract), Vitamin A Palmitate.

treatment, enzymes and heat.

48.    When heat is applied to starch, the granules gelatinize, forming a mixture of thick, soft, and creamy consistency

49.    The heat causes the starch to become resistant to digestive enzymes ("resistant starch") so that it acts like dietary fiber without containing any fiber.

50.    The Products' use of resistant starch in the form of soluble corn fiber is not for its sweetening contribution, since this role is filled by the combination of erythritol, stevia and sugar.

51.    Water-soluble fiber serves a variety of functions such as viscosity enhancement, emulsion stabilization and freeze/thaw protection.

52.    The use of soluble corn fiber as a fat replacer has been recognized by experts in the food processing field, with studies concluding that it was superior to the dairy-derived whey protein concentrate. whey-based proprietary ingredient Simplesse.

53.    The maltodextrins (soluble corn fiber) form a thermo-reversible gel or macromolecular network that gives rise to their fat mimetic properties, imparting a creamy mouthfeel to low fat ice cream products.

54.    Manufacturers of soluble corn fiber have touted its application to frozen dairy dessert products, stating that ice cream "can be made low-fat or no-fat by reducing or replacing the milk fat" with the proprietary maltodextrin, so that "The body and creamy texture of the ice cream will be preserved, along with a clean taste, and little or no impact on sweetness. Additionally, the freezing point is not affected, and it helps to control large ice crystal formation."[15]

55.    Though soluble corn fiber may have functional advantages over other ingredients used to replace the fat content of ice cream, its use in significant amounts renders the

---

[15] PreparedFoods.com, June 1, 2009.

representations as "low fat ice cream" false, misleading and deceptive.

56. This is because the characterizing ingredients of ice cream are required to be derived from dairy sources.

57. By replacing or exchanging the fat contents or ingredients with other ingredients ingredients *that simulate the effects of fat*, with ingredients derived from a *wholly different source* – i.e., vegetables as opposed to dairy – because it alters the dairy character of the food.[16]

58. This is the expectation of reasonable consumers and was the conclusion of the FDA during the rulemaking process.

59. The inclusion of the fat analog soluble corn fiber is not an acceptable inclusion to a modified ice cream product, because fat analogs used in dairy products must be from a dairy source.

60. By replacing or exchanging the role played by milkfat in ice cream products with a corn fiber, consumers are misled because they expect ice cream to be a dairy product and possess attributes of such a product.

61. The allowance to use ingredients safe and suitable ingredients was not intended to allow for the replacement or exchange of fat with a functionally similar ingredient from sources not provided for by the standard.[17]

62. The purpose behind limiting the use of fat analogs to those appropriate for a particular product is to limit deviations from the standardized products to those reductions really necessary to achieve reductions of fat while maintaining all other characteristics of the food.

63. The regulations were never intended to permit ice cream products consisting of significant amounts of "corn fiber" simulating the role and properties of milkfat.

---

[16] 21 C.F.R. § 130.10(d)(2)
[17] 21 C.F.R. § 130.10(d)(1) Rulemaking.

64.    Moreover, even if soluble corn fiber was permitted as a fat replacer, it is present in an amount exceeding that which is necessary to perform that function.

65.    The Products also diverge from the performance characteristics of ice cream due in part to the soluble corn fiber and erythritol and their effects on the Products.

66.    Erythritol is a sugar alcohol of small molecular size (1/3 of sucrose), resulting in a threefold of freezing point depression factor.

67.    This causes an ice cream product to be chilled to lower temperatures to achieve the desired texture.

68.    Moreover, erythritol has a stronger tendency to crystallize after freezing which hardens the texture

69.    The other ingredients are not present in amounts sufficient to counteract this hardness, resulting in a product which is incompatible with the properties of ice cream modified by an express nutrient content claim.

70.    The Products' mouthfeel, texture and melting rate are dissimilar to light ice cream products.

71.    Excluding tax, the Products cost no less than $4.99, a premium price compared to other similar products.

<u>Jurisdiction and Venue</u>

72.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

73.    Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

74.    This Court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

75.    Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and in New York.

76.    A substantial part of events and omissions giving rise to the claims occurred in this District.

<u>Class Allegations</u>

77.    The classes consist of (1) all consumers in all states and (2) all consumers in New York State who purchased any Products bearing any actionable representations during the statutes of limitation periods.

78.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.

79.    The class is so numerous that joinder of all members, even if permitted, is impracticable, as there are likely hundreds of thousands of members.

80.    Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff and class members are entitled to damages.

81.    Plaintiff's claims and the basis for relief are typical to other members because all were subjected to the same representations.

82.    Plaintiff is an adequate representative because his/her interests do not conflict with other members.

83.    No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

84.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

85.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

86.    Plaintiff seeks class-wide injunctive relief because the practices continue.

Parties

87.    Plaintiff is a citizen of Nassau County, New York.

88.    Defendant is a Delaware corporation with a principal place of business in Englewood, New Jersey.

89.    In 2017 and/or 2018, plaintiff purchased the Product(s) for no less than $4.99 per Product(s), excluding tax, at a store within this District.

90.    Plaintiff paid this premium because prior to purchase, plaintiff saw and relied on the misleading representations.

Violations of New York General Business Law §§ 349 & 350

91.    Plaintiff incorporates by references all preceding paragraphs.

92.    Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

93.    Plaintiff desired to purchase ice cream and believed that he/she did so based on the representations of defendant.

94.    Defendant's representations are false, deceptive and misleading for the reasons described herein.

95.    The representations and omissions were relied on by plaintiff and class members, who paid more than they would have without getting all they bargained for.

Negligent Misrepresentation

96.    Plaintiff incorporates by references all preceding paragraphs.

97.   Defendant misrepresented the composition of the Products by describing and identifying them as "low fat ice cream" when they in fact consisted of ingredients not consistent with consumer expectations and FDA regulations for the identification of said product.

98.   Defendant had a duty to disclose, in a manner prescribed by law, that its Products were not ice cream due to the ingredient substitutions present therein.

99.   At the time of the representations, defendant knew or should have known same were false or misleading, especially because Breyers is one of the oldest ice cream companies in the country.

100.   Defendant negligently misrepresented and/or negligently omitted material facts.

101.   Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

102.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, thereby suffering damages.

<u>Breach of Express Warranty and Implied Warranty of Merchantability</u>

103.   Plaintiff incorporates by references all preceding paragraphs.

104.   Defendant manufactures and sells frozen dairy dessert products purporting to consist of ingredients in amounts and in a proportion which is consistent with ice cream.

105.   Defendant warranted to plaintiff and class members that the Products were ice cream when they were not.

106.   The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions.

107.   Plaintiff and class members relied on defendant's claims, paying more than they would have otherwise.

Fraud

108.   Plaintiff incorporates by references all preceding paragraphs.

109.   Defendant's purpose was to mislead consumers who seek the indulgence of ice cream as opposed to a frozen dairy dessert.

110.   Defendant's intent was to keep pace with "ice cream" upstarts which brandish their calories and protein to entice consumers with "better for you" versions of ice cream.

111.   Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have otherwise, entitling them to damages.

Unjust Enrichment

112.   Plaintiff incorporates by references all preceding paragraphs.

113.   Defendant obtained benefits and monies because the Products were not as represented, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of such inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

  **WHEREFORE,** plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying plaintiff(s) as representative and the undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing defendant(s) to correct its/their practices to comply with the law;

3.  Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and GBL claims;

4.  Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and

experts; and

5.  Such other and further relief as the Court deems just and proper.

Dated:   May 18, 2018

Respectfully submitted,

Levin-Epstein & Associates, P.C.
/s/Joshua Levin-Epstein
Joshua Levin-Epstein
1 Penn Plaza, Suite 2527
New York, NY 10119
Tel: (212) 792-0046

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
891 Northern Blvd., Suite 201
Great Neck, NY 11021
Tel: (516) 303-0552
spencer@spencersheehan.com

2:18-cv-02977
United States District Court
Eastern District of New York

Franco Condon individually and on behalf of all others similarly situated

Plaintiff

- against -

Unilever United States, Inc.

Defendant(s)

# Complaint

Levin-Epstein & Associates, P.C.
1 Penn Plaza # 2527
New York, NY 10119
Tel: (212) 792-0046
Fax: (212) 563-7108

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  May 18, 2018

/s/ Joshua Levin-Epstein
Joshua Levin-Epstein